**The Cardoza Law Corporation**
Michael F. Cardoza, Esq. (SBN: 194065)
Mike.Cardoza@cardozalawcorp.com
Lauren B. Veggian, Esq. (SBN: 309929)
Lauren.Veggian@cardozalawcorp.com
548 Market St., #80594
San Francisco, CA 94104
Telephone: (415) 488-8041
Facsimile: (415) 651-9700
*Attorneys for Plaintiff,*
Pamela D. Reid, individually and as Trustee of the JOHN T. AND PAMELA D. REID LIVING TRUST

**UNITED STATES DISTRICT COURT**
**FOR THE**
**CENTRAL DISTRICT OF CALIFORNIA**

**PAMELA D. REID, INDIVIDUALLY AND AS TRUSTEE OF THE JOHN T. AND PAMELA D. REID LIVING TRUST,**

Plaintiff,

v.

**BANK OF AMERICA, N.A.,**

Defendant.

**Case No.: __________**

**COMPLAINT FOR DAMAGES FOR VIOLATIONS OF:**

1) **THE ELECTRONIC FUND TRANSFER ACT, 15 U.S.C. § 1693, ET SEQ.**
2) **ELDER FINANCIAL ABUSE, CAL. WELFARE AND INSTITUTIONS CODE CODE §§ 15610, ET SEQ.; AND**
3) **NEGLIGENCE**

**DEMAND FOR JURY TRIAL**

///

///



THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

## INTRODUCTION

1. For nearly 50 years, Pamela, a widow living alone, had placed her complete trust in Bank of America. That security first shattered on Mar 12, 2025, when she discovered her life savings had been completely wiped out. While the bank eventually refunded those funds and advised her to open a new account, the experience left her deeply unsettled.

2. The present crisis began on July 2, 2025, at 3:52 PM, when Pamela received a text message that appeared to be a legitimate security alert from Bank of America warning of fraudulent activity in Florida. She called the number provided and was greeted by a man who sounded exactly like a professional bank representative. He walked her through what she believed were security protocols—even providing a fake case number and FedEx tracking number for a "new" debit card—while he was actually using the verification codes she provided to facilitate a massive unauthorized transfer.

3. On July 4, 2025, Pamela discovered a devastating $87,548.00 withdrawal from her account, sent to a stranger named "Robert Taylor". Despite reporting the fraud immediately, Bank of America's response was a total betrayal of trust. After weeks of silence, the bank denied her claim on July 21, 2025, coldly asserting the transfer was "consistent with previous activity" because it allegedly came from a known device—a claim Pamela and her son, Jack, insist was impossible as she never entered the recipient's information.

4. When she sought help again, the bank re-categorized her case as a "scam claim," requiring her to sign an acknowledgment that she was "forfeiting" the money with no guarantee of recovery. The impact has been severe: Pamela, 83, has suffered from significant anxiety, a loss of appetite, and persistent trouble sleeping. She has largely stopped using online banking because she no longer feels safe. Today, she is motivated by a desire to ensure no other vulnerable

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

person faces the same disregard from an institution she trusted for nearly half a century.

5. **PAMELA D. REID, INDIVIDUALLY AND AS TRUSTEE OF THE JOHN T. AND PAMELA D. REID LIVING TRUST** ("Plaintiff"), by Plaintiff's attorney, brings this action for actual damages, statutory damages, attorneys fees, and costs, against **BANK OF AMERICA, N.A.** for violations of the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq. (hereinafter "EFTA").
6. Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to the Plaintiff, or to the Plaintiff's counsel, which Plaintiff alleges on personal knowledge.
7. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.
8. All violations by Defendant were knowing, willful, and intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violations.
9. Unless otherwise indicated, the use of a Defendant's name in this Complaint includes all agents, principles, managing agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of that Defendant named.

## JURISDICTION AND VENUE

10. Jurisdiction of this court arises pursuant to 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States, 15 U.S.C. § 1693 et seq., and pursuant to 28 U.S.C. § 1367 for pendent state law claims.
11. This action arises out of Defendant's violations of the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq. (hereinafter "EFTA").

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the acts and transactions occurred here, Plaintiff resides here, and Defendant transacts business here.

**EFTA**

13. "To address concerns raised by the increasing prevalence of electronic banking transactions, Congress enacted the Electronic Fund Transfer Act of 1978 (EFTA), 15 U.S.C. § 1693 *et seq.* Lawmakers viewed such transactions—processed through computer networks without human interaction—as 'much more vulnerable to fraud, embezzlement, and unauthorized use than the traditional payment methods.'" *Bank of America v. City and County of San Francisco*, 309 F.3d 551, 564 (9th Cir. 2002) (quoting H.R. Rep. No. 95-1315, at 2 (1978)).

14. In the late 1970s, the American financial system began a profound shift away from paper checks and toward the "mysteries of the computer age."[1] The National Commission on Electronic Fund Transfers (NCEFT), established by Congress to investigate this phenomenon, declared in October 1977 that the nation was witnessing "a significant new choice" in financial affairs that marked "the transition to the post-industrial society."[2] This new landscape was characterized by "automated teller machines," "point-of-sale transfers," and "direct deposits" initiated by magnetic tape rather than paper instruments.[3]

15. For the banking industry, this transition offered the promise of immense profitability through efficiency. Congress recognized that these services offered "substantial cost savings" to financial institutions and the potential for "greater

[1] Ronald L. Winkler, *The National Commission on Electronic Fund Transfers: Problems and Prospects*, Wash. U. L. Q. 507 (1977).
[2] *Final Report of the National Commission on Electronic Fund Transfers,* "EFT in the United States," p. 1 (Oct. 28, 1977).
[3] 15 U.S.C. § 1693a(7)

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

convenience, lower cost, increased security, and more efficient services."[4] By replacing labor-intensive paper processing with electronic signals, financial institutions stood to gain from the "economies of scale" inherent in mass data processing.[5]

16. However, this technological leap created a legal vacuum. As the Senate Committee on Banking, Housing, and Urban Affairs noted in 1978, existing consumer protection laws "were not drafted with EFT in mind, leaving the rights of consumers, as well as financial institutions... undefined in the law."[6] This uncertainty led to "legitimate consumer concerns" regarding the safety of their funds.[7] Unlike the check system, where a consumer could stop payment or verify a signature, EFT removed the consumer's direct control. The NCEFT found that consumers were rightfully asking: "How can the consumer be assured that he does not lose control of his financial transactions?"[8]

17. The banking industry and Congress realized that the electronic revolution would fail without the public's trust. In its Final Report, the NCEFT warned that "the future of EFT is inextricably tied to consumer acceptance."[9] The Commission concluded that the technology "must fulfill consumer needs," and if it failed to provide confidence, it was "unlikely to grow beyond its early stages."

18. To solve this impasse, Congress enacted the Electronic Fund Transfer Act (EFTA) as a statutory "grand bargain." The legislation was designed to provide "dual benefits": it would allay consumer concerns by creating a "Bill of Rights,"

---

[4] S. Rep. No. 95-915, at 2 (1978)
[5] *See* 12 C.F.R. Part 1005, Supp. I, Comment 2(b)-2 (discussing economic function). *See generally Final Report of the National Commission on Electronic Fund Transfers* at 133 (discussing economies of scale).
[6] S. Rep. No. 95-915, at 2 (1978).
[7] *Id.*, at 3.
[8] *Final Report of the National Commission on Electronic Fund Transfers*, p. 16 (Oct. 28, 1977).
[9] *Id.*, at. 4.

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

while simultaneously providing financial institutions "a clear picture... of what their liabilities would be, enabling them to make more informed decisions on participating in EFT systems."[10]

19. Central to this bargain was the rejection of "private contract" as a means to determine liability for errors and fraud. The NCEFT viewed the "bargaining power between EFT providers and most customers" as "unequal." [11] Consequently, the Commission and Congress determined that liability rules must be set by federal statute, rather than by bank agreements, to ensure that "maximum protection should be provided to the individual consumer."[12]

20. Thus, the EFTA was passed with the explicit Congressional declaration that "the primary objective of this title, however, is the provision of individual consumer rights."[13] Under this framework, Financial Institutions gained the profitable efficiency of automation, but in exchange, they accepted strict procedures for error resolution and liability. When a Financial Institution fails to adhere to these statutory responsibilities, it disrupts the balance of the "grand bargain" that allows the electronic banking system to exist.

## California Elder Abuse and Dependent Adult Civil Protection Act (EADACPA)

21. Recognition of a Vulnerable and Disadvantaged Class (1982): In 1982, the California Legislature enacted EADACPA, recognizing that elders and dependent adults constitute a significant and identifiable segment of the population particularly subject to risks of abuse, neglect, and abandonment. The Legislature declared that the state has a responsibility to protect these persons, specifically finding that infirm elderly persons are a "disadvantaged class".

---

[10] S. Rep. No. 95-915, at 3 (1978).

[11] *Final Report of the National Commission on Electronic Fund Transfers*, p. 55 (Oct. 28, 1977).

[12] *Id.* at 56.

[13] 15 U.S.C. § 1693(b); Pub. L. 95-630, Title XX, § 902(b).

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

Lawmakers noted that civil cases were rarely brought in connection with elder abuse due to "problems of proof, court delays, and the lack of incentives" for attorneys to take up these causes.

22. The 1991 Remedial Expansion - Creating Incentives: In 1991, the Act was substantively amended to encourage victims and their attorneys to prosecute claims of egregious abuse in a civil forum. These amendments added Welfare & Institutions Code § 15657, providing for the recovery of attorney's fees, costs, and punitive damages to enable interested persons to engage counsel to protect abused elders.

23. The 2008 "Wrongful Use" Transformation (SB 1140): In 2008, the Legislature enacted Senate Bill 1140, which significantly lowered the bar for proving financial elder abuse. Before 2008, a plaintiff had to prove that property was taken in "bad faith". SB 1140 redefined "wrongful use" to an expansive **"knew or should have known"** standard. The law now deems a person or entity to have taken property for a wrongful use if they knew or should have known that their conduct was "likely to be harmful to the elder". This amendment effectively ended the concept of *"let the elder beware"* in property transactions, shifting the burden to the perpetrator (or financial institution) to avoid conduct likely to harm the senior citizen.

24. The Sentinel Role of Financial Institutions: SB 1018. Recognizing that financial institutions are often the "only potential defense" against exploitation, the California Legislature enacted the Financial Elder Abuse Reporting Act of 2005 (SB 1018) to transform banks from passive observers into proactive sentinels. Effective January 1, 2007, the Act designated all bank officers and employees as "mandated reporters" who must immediately notify authorities of "suspected financial abuse". This mandate is triggered by **"red flags"**—including transactional activity that deviates from the norm, unusual secrecy, or uncharacteristic attempts to transfer large sums—which bank employees are

uniquely positioned to spot. While the Act provides civil penalties rather than a private right of action for the simple failure to file a report, it reinforces an institution's "existing responsibility" to its customers and serves as the **statutory baseline** for institutional knowledge. By codifying the specific indicators of abuse that an institution is legally charged to recognize, SB 1018 ensures that when a bank ignores these red flags, it cannot claim ignorance; rather, it satisfies the **"should have known"** standard of liability under the broader EADACPA framework, establishing that any subsequent "assistance" in a fraudulent transfer is inherently wrongful.

## PARTIES

25. Plaintiff is a natural person who resides in the County of Orange, State of California. Plaintiff is currently and at all times complained of, a “Person” as that term is defined by Regulation E in 12 C.F.R. 1005.2(j). At all times, Plaintiff was an “elder” over the age of 65 and a “senior citizen” as defined by Welf. & Inst. Code § 15610.27 and Cal. Civ. Code § 1761(f).

26. Plaintiff brings this action in her individual capacity and in her capacity as the Trustee of the John T. and Pamela D. Reid Living Trust. As Trustee, she holds legal title to the account and the "chose in action" for economic losses; individually, she holds the right to recover personal injury damages for emotional distress.

27. Defendant Bank of America, N.A. (hereinafter “Defendant BofA”) is a National Bank corporation operating from an address of 100 North Tryon St., Charlotte, NC 28255 and is a “person” as defined by Regulation E in 12 C.F.R. 1005.2(j). Defendant is a “Financial Institution” as that term is defined by Regulation E in 12 C.F.R. 1005.2(i).

## FACTUAL ALLEGATIONS

28. Plaintiff is an individual residing in the County of Orange in the State of California.

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

29. Plaintiff is informed and believes, and thereon alleges, that at all times relevant, Defendant conducted and continues to conduct business in the State of California.

30. Plaintiff's account with Defendant constitutes an "account" as defined by 15 U.S.C. § 1693a(2); and, 12 C.F.R. 1005.2(b)(1).

31. Plaintiff's account with Defendant is primarily for personal, family, or household purposes.

32. For 49 years, Plaintiff maintained a banking relationship with Defendant Bank of America, N.A.

33. On Mar 12, 2025, Plaintiff discovered her savings account balance had been completely depleted. Defendant eventually refunded the missing funds and instructed Plaintiff to close the compromised account and open a new savings account.

34. On Apr 03, 2025, Plaintiff's accounts were again compromised by 17 fraudulent transactions totaling approximately $100,000. Following an investigation, Defendant refunded these fraudulent charges.

35. On Jul 02, 2025, at 3:52 PM, Plaintiff received a text message—appearing to originate from Defendant's legitimate notification system—stating her debit card was being used fraudulently in Florida.

36. Plaintiff called the number provided in the text and spoke with an individual who identified himself as a Bank of America employee. This individual provided Plaintiff with a specific bank case number (C30251839) and a FedEx tracking number (882517330816) for a replacement debit card.

37. While the individual kept Plaintiff on the phone for several minutes providing tips on debit card security, a transfer of $87,548.00 was initiated from Plaintiff's savings account to an unknown third party, "Robert Taylor."

38. Plaintiff did not authorize this transfer, did not enter the recipient's information, and did not "push the button" to execute the transaction.

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

39. On Jul 04, 2025, Plaintiff discovered the $87,548.00 unauthorized withdrawal and immediately called BofA at the following contact numbers to report the unauthorized transactions.
    a. 800-432-1000 at 11:15 AM for four minutes, and 11:24 AM for two minutes.
    b. 866-758-5972 at 11:26 AM for three minutes.
    c. 888-888-7937 at 11:38 AM for four minutes.
    d. 800-317-6345 at 11:56 AM for twenty-nine minutes.
40. BofA failed to provisionally recredit the account within 10 business days.

The Bad Faith Investigation and Deceptive Reclassification

41. On July 21, 2025, BofA denied the claim in writing, referring to it as a "fraud claim," and citing the manufactured excuse that the login happened from a "known device."
    a. The notice did not provide any proof that Plaintiff actually authorized the transfers.[14]
42. The July 21, 2025, letter that Defendant sent to Plaintiff denying her fraud claim stated the claim was denied because the transaction was completed using a device "consistent with previous valid account activity," despite Plaintiff's prior report that her account security had been compromised.
43. In its denial letter, Defendant informed Plaintiff she had the right to request the documents and data Defendant relied upon to reach its decision.
44. Defendant closed the fraud claim without returning Plaintiff's money.

[14] 15 U.S.C. § 1693g(b) – "Burden of Proof: In any action which involves a consumer's liability for an unauthorized electronic fund transfer, the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized...".

45. On Jul 23, 2025, Plaintiff filed an incident report with the Orange County Sheriff's Department. Upon informing Defendant of the police report, Defendant re-categorized the matter as a "scam claim" rather than a "fraud claim".

46. Additionally, in a July 24, 2025, letter to Plaintiff, BofA claimed that Plaintiff notified them on 7/23/2025 that *she* transferred funds from her account to a third party as a result of a scam. This is not what happened.

   a. On information and belief, BofA deceptively reclassified Plaintiff's report of the unauthorized transfer from a "fraud claim" to a "scam claim."

   b. On information and belief, BofA did this specifically to avoid its recrediting obligations, despite, on information and belief, possessing data showing Plaintiff never entered the recipient's information.

47. On Jul 24, 2025, Defendant sent Plaintiff a "Scam Victim Acknowledgment" form. This document required Plaintiff to acknowledge there was "no guarantee" the bank would recover her funds and offered no provisional credit during the new investigation period.

48. On Feb 12, 2026, Plaintiff sent a formal written request to Defendant via certified mail specifically invoking the Electronic Fund Transfer Act and demanding copies of all documents, logs, and evidence used to deny her claim.

49. Plaintiff's request explicitly sought the IP address, device ID, location data, and internal investigation notes associated with the unauthorized transfer.

50. USPS records confirm that Plaintiff's formal request for evidence was delivered to and picked up at Defendant's postal facility in Sacramento, CA, on Feb 18, 2026, at 7:55 AM.

51. Despite the confirmed delivery of this request and the statutory requirements of the Electronic Fund Transfer Act, Defendant has failed to provide the requested documentation or a response.

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

52. Defendant did not make a good faith investigation of the unauthorized electronic fund transfers.

53. Defendant did not have a reasonable basis for believing that Plaintiff's account was not in error.

54. Defendant knowingly and willfully concluded that Plaintiff's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to Defendant at the time of its investigation.

55. Defendant has failed to provide a credible explanation for the denial or show that it performed any meaningful investigation into how the unauthorized access occurred.

56. Defendant is "retaining" Plaintiff's property for a "wrongful use" because it knows its retention violates federal law and is harmful to an elder.

57. Defendant had actual knowledge of Plaintiff's vulnerability from the April 2025 attack and gave substantial assistance to scammers by processing a transfer grossly inconsistent with her history.

58. Defendant's conduct was despicable and performed with reckless disregard for Plaintiff's rights. BofA chose to "bait-and-switch" the claim to protect its own profits, satisfying the standards for punitive damages under Cal. Civ. Code § 3294 and the survival of noneconomic damages under WIC § 15657 and CCP § 377.34.

59. Defendant breached its duty of care by failing to suspend the account in the face of obvious "red flags" and suspicious activity.

60. As a financial institution operating in California, Defendant BofA and its officers are "mandated reporters" of suspected financial elder abuse under Welfare & Institutions Code § 15630.1.

61. BofA had heightened "actual knowledge" of Plaintiff's extreme vulnerability due to two prior devastating fraud events in March and April 2025, the latter of which involved 17 fraudulent transactions totaling approximately $100,000.

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

62. Despite this history, BofA failed to implement any specialized monitoring or "hard blocks" on Plaintiff's new savings account to protect her retirement assets.

63. On July 2, 2025, a transfer of $87,548.00 was initiated from Plaintiff's savings account to an unknown third party, "Robert Taylor".

64. This transaction triggered multiple "red flags" that BofA, as a mandated reporter, was legally charged to recognize and investigate before processing:

   a. Uncharacteristic Transaction: The $87,548.00 transfer was grossly inconsistent with the account's 30-year history, which had never had a direct ACH draft or third-party transfer.

   b. Size and Velocity: The transfer constituted a massive and sudden depletion of nearly 75% of the account's remaining balance.

   c. High-Risk Profile: The transaction occurred on an account BofA knew belonged to an 83-year-old widow who had been successfully targeted by scammers twice in the preceding 90 days.

65. Plaintiff is informed and believes, and thereon alleges, that despite these glaring indicators of elder exploitation, BofA did not file a Suspected Financial Abuse Report (SFAR) with local law enforcement or Adult Protective Services regarding the March 2025, April 2025, or July 2025 frauds.

66. Instead of protecting its elderly customer, BofA gave "substantial assistance" to the scammers by processing the transfer and subsequently re-categorizing the loss as a "scam claim" on July 23, 2025.

67. This re-categorization was a "bait-and-switch" tactic designed to force Plaintiff to sign a "Scam Victim Acknowledgment" stating there was "no guarantee" of recovery, thereby attempting to shift the burden of loss from the bank to the victim.

68. By ignoring these red flags and failing to report the suspected abuse, BofA's retention of the funds is "wrongful" because the bank "should have known" (and did know) its conduct was likely to be harmful to an elder.

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

## ACTUAL DAMAGES

69. Plaintiff has suffered actual damages as a result of these illegal tactics by this Defendant in the form of, financial loss, invasion of privacy, personal embarrassment, loss of personal reputation, loss of productive time, nausea, and feelings of fear, anxiety, hopelessness, anger, persecution, emotional distress, frustration, upset, humiliation, and embarrassment, amongst other negative emotions.

70. Plaintiff has developed anxiety toward online banking and has been reluctant to engage in any transactions through online banking options.

71. Plaintiff faced the embarrassment of having to inform her son that she had been a victim of fraud.

72. Plaintiff further had to depend on her son in order to purchase a new car, which her son purchased up front on or around July 27, 2025, for $43,942.95.

73. On or around July 30, 2025, Plaintiff reimbursed her son for this purchase.

74. Plaintiff felt increasingly vulnerable as a result of the fraud, which worsened her existing feelings of vulnerability in living alone.

## PUNITIVE DAMAGES

75. Defendant Bank of America acted with recklessness, oppression, and malice by intentionally ignoring its own internal 'red flags' and its actual knowledge of Plaintiff's high-risk profile following her April 2025 fraud loss (which they properly and promptly reimbursed). Instead of performing a good-faith investigation, Defendant engaged in a deceptive reclassification of Plaintiff's 'fraud' claim as a 'scam' claim for the sole purpose of shifting the burden of loss to a grieving widow and protecting its own corporate profits. This 'bait-and-switch' tactic was despicable conduct performed with a conscious disregard for Plaintiff's financial security and emotional well-being, subjecting a known vulnerable elder to cruel and unjust hardship.

## CAUSES OF ACTION CLAIMED BY PLAINTIFF

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

**COUNT I**

**VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT**

**15 U.S.C. § 1693G(A), (EFTA)**

76. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

77. Defendant violated 15 U.S.C. § 1693g(a) by holding Plaintiff liable for unauthorized electronic fund transfers in excess of the statutory liability limits (typically $50 or $500) and by failing to reimburse Plaintiff for funds stolen through unauthorized transfers that were reported to Defendant.

**COUNT II**

**15 U.S.C. § 1693F(C), (EFTA)**

78. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

79. Defendant violated 15 U.S.C. § 1693f(c) by failing to provisionally recredit Plaintiff's account for the amount of the alleged error (plus applicable interest) within ten business days of receiving Plaintiff's notice of error, while simultaneously extending its investigation period beyond the ten-day statutory limit.

**COUNT III**

**15 U.S.C. § 1693F(A), (EFTA)**

80. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

81. Defendant violated 15 U.S.C. § 1693f(a) by failing to conduct a good faith, reasonable investigation to determine whether an error occurred. Instead of conducting a genuine inquiry, Defendant relied on insufficient data or generic transaction logs to deny the claim.

**COUNT IV**

**15 U.S.C. § 1693F(E)(2), (EFTA)**

82. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

83. Defendant violated 15 U.S.C. § 1693f(e)(2) by knowingly and willfully concluding that the consumer's account was not in error when such a conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation.

**COUNT V**

**15 U.S.C. § 1693F(D), (EFTA)**

84. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

85. Defendant violated 15 U.S.C. § 1693f(d) by failing to promptly deliver or mail to Plaintiff, upon Plaintiff's request, reproductions of the specific documents and data upon which Defendant relied to conclude that no error occurred.

**COUNT VI**

**VIOLATION OF THE ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT**

**WIC § 15610 ET SEQ.**

86. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

87. Defendant is liable for financial elder abuse under Welfare & Institutions Code § 15610.30 through both its wrongful retention of Plaintiff's funds and its substantial assistance to the primary scammers. Defendant 'retains' Plaintiff's $87,548 for a wrongful use because it knows its refusal to recredit the unauthorized transfer violates federal law and is harmful to a senior citizen. Furthermore, Defendant 'assisted' in the taking of Plaintiff's property by processing a massive, uncharacteristic ACH transfer despite having actual and constructive knowledge of Plaintiff's vulnerability to such exploitation.

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

Because Defendant 'should have known'—and by virtue of its mandated reporter status and the April 2025 fraud, did know—that its conduct would result in the theft of an elder's retirement assets, its conduct constitutes a per se violation of the Act, entitling Plaintiff to compensatory damages, mandatory attorney's fees, and enhanced remedies." The foregoing acts and omissions constitute numerous and multiple violations of the Elder Abuse and Dependent Adult Civil Protection Act.

## COUNT VII

## NEGLIGENCE

88. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

89. A defendant is liable for the tort of negligence when it fails to use reasonable care to prevent harm to others, and when the defendant's actions or failure to act is a substantial factor in causing harm to the plaintiff.

90. Defendant Bank of America, through its managing agents and officers, acted with recklessness, oppression, and malice by maintaining and enforcing corporate policies that prioritize automated speed over the safety of known vulnerable elders. Despite possessing actual knowledge of Plaintiff's high-risk profile following her April 2025 fraud loss, Defendant willfully and deliberately failed to implement simple, industry-standard verification protocols for the $87,548 transfer. Defendant's subsequent, intentional 'bait-and-switch' reclassification of the claim—done with the specific intent to deprive Plaintiff of her statutory recrediting rights—constitutes despicable conduct and a conscious disregard for Plaintiff's rights. This conduct subjected Plaintiff to cruel and unjust hardship during a period of documented bereavement, satisfying the 'clear and convincing' standard for punitive damages under Civil Code § 3294 and the survival of noneconomic damages

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

under WIC § 15657.5 and CCP § 377.34.

91. As a direct result of Defendants' lack of due care, Plaintiff suffered actual damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that judgment be entered against Defendant for:

a) Award of actual damages pursuant to 15 U.S.C. § 1693m(a)(1), and pursuant to Cal Civ §15657.5 against Defendant and for Plaintiff, and,

b) Award of Punitive damages and pursuant to Cal Civ §3294.

c) Award of Treble damages pursuant to 15 U.S.C. § 1693f(e), against Defendant and for Plaintiff, and,

d) Award of statutory damages pursuant to 15 U.S.C. § 1693m(a)(2)(A), against Defendant and for Plaintiff, and,

e) Award of costs of litigation and reasonable attorney's fees pursuant to 15 U.S.C. § 1693m(a)(3), and pursuant to Cal Civ §15657.5 against Defendant and for Plaintiff, and,

f) Award of Treble damages pursuant to Cal Civ §3345, against Defendant and for Plaintiff, and,

g) the survival of pain and suffering damages under WIC § 15657.5(b) and CCP § 377.34, and,

h) Award to Plaintiff of such other and further relief as may be just and proper, including but not limited to, restitution, declaratory and injunctive relief.

**<u>TRIAL BY JURY IS DEMANDED</u>**

92. Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

**THE CARDOZA LAW CORPORATION**

DATED: June 15, 2026

BY: /s/ Michael F. Cardoza
MICHAEL F. CARDOZA, ESQ.
ATTORNEY FOR PLAINTIFF
PAMELA D. REID, INDIVIDUALLY AND AS TRUSTEE OF THE JOHN T. AND PAMELA D. REID LIVING TRUST

THE CARDOZA LAW CORPORATION
548 MARKET ST. #80594
SAN FRANCISCO, CA 94104

## ELECTRONICALLY STORED INFORMATION REQUEST

This notice is to demand that you preserve all documents, tangible things and electronically stored information ("ESI") potentially relevant to any issues in the above-entitled matter. This specifically includes, but is not limited to, all information pertaining to the above matter, including specifically all recordings of any telephone communication between your company and Plaintiff.

As used in this request, "you" and "your" or "your client" refers to your organizations, and its predecessors, successors in interest, assignees, parents, subsidiaries, divisions or affiliates, and their respective officers, directors, employees, servants, agents, attorneys, and accountants.

Much of the information subject to disclosure or responsive to discovery is stored on your client's current and former computer systems and other media and devices (such as: personal digital assistants, voice-messaging systems, online repositories and cell phones).

Electronically stored information ("ESI") should be afforded the broadest possible definition and includes (for example and not as an exclusive list) potentially relevant information whether electronically, magnetically or optically stored.

This preservation obligation extends beyond ESI in yours or your client's care, possession or custody and includes ESI in the custody of others that is subject to your client's direction or control. You must notify any current or former agent, attorney, employee, custodian or contractor in possession of potentially relevant ESI to preserve such ESI to the full extent of your client's obligation to do so, and you must try to secure their compliance.